The first case on the calendar is United States v. Lambus. May it please the Court. My name is Michael Rabatti and I represent the United States. The question on this appeal is whether the District Court erred in suppressing the government's wiretap and location data evidence. This Court should reverse the District Court's ruling for two reasons. First, the District Court's suppression order directly contradicts this Court's decisions in Bianco and Roger Rottnum because it failed to apply the Frank Standard in evaluating the government's wiretap applications. Second, the GPS monitoring of Fourth Amendment. And, at a minimum, the state and federal officers acted in good faith reliance on binding appellate precedent in conducting that search. So to begin, the government would like to turn to the Franks issue. In its order, the District Court simply got the law wrong. Roger Rottnum and Bianco clearly held Franks applied to alleged omissions and misstatements in wiretap applications. Here, the District Court did not apply the Franks Standard. In particular, it did not conduct a materiality analysis. Rather, it concluded that it had two alternative routes to suppression. First, under the wiretap statute, it held that an intentional misstatement was sufficient on its own to justify suppression. And second, in any event, it held that it had inherent authority to suppress the wiretap evidence without making a materiality determination. As I understand your papers, you're asking us to determine for ourselves whether the statement was material. But why would we do that? Why wouldn't we vacate and send this back to the District Court for that determination to be made in the first instance? Yes, Your Honor. The government is asking this court to make that determination at this point. There are no additional facts that the District Court would need to find with respect to materiality in this case. Under the materiality analysis, this court looks to the corrected affidavit doctrine. Here, simply the court would add the omitted information into the challenged after adding that omitted information into the affidavit. That can be done here without any additional factional findings by the District Court. It's simply adding that information back in and assessing whether or not there's probable cause and necessity. And the government would note that when the court does that analysis, there is clearly a residue of probable cause and necessity in this case. And this is not a hypothetical analysis here. Because the court, in fact, did submit corrected affidavits to the District Court below in this case. In particular, following the challenged affidavit, the court submitted four additional wiretap applications. In those four additional wiretap applications, the government included the wiretap information, the wiretap investigations that were omitted from that first affidavit. Three different judges of the District Court granted those four different wiretap applications. So that shows when the corrected affidavit doctrine analysis is done here, in fact, there would be probable cause and necessity. Why is that necessarily the case? Because the later wiretap applications presumably contained additional information, including the fruits of the first wiretap. That is correct, Your Honor. There were some additional facts in the later wiretap applications. But I think it is indicative here that the court nonetheless granted those wiretap applications with this omitted information. And we can just look at the facts in the first wiretap affidavit and determine that there is also probable cause and necessity. In that regard, I think it's important to focus on the fact that the first wiretap application was directed towards Earl Davis, not the defendant K. Mel Lambus, not the defendant Stanley Froehler. It was Earl Davis and the telephone that he was using. Earl Davis was not a target of the 2011 wiretap application that was omitted from the first affidavit or the 2003 and 2004 applications that were omitted. Those earlier wiretap investigations had no bearing, no relation to Earl Davis. So it had nothing to do with whether or not there was probable cause to tap Earl Davis's phone. That probable cause was based on a confidential informant who arranged a heroin transaction at the end of 2014 with Earl Davis over the target telephone and Earl Davis's contact with other suspected traffickers. If anything, those earlier wiretaps would strengthen the probable cause analysis in this wiretap affidavit because it showed that associates of Earl Davis, namely Shavonna Trappier, Stanley Froehler, and a couple of others, had been the subjects of earlier heroin trafficking investigations. But that was just background information that would have gone to probable cause. The probable cause here was based on this confidential informant buying heroin. The district court in this case made a determination that the agent had made a knowing fault statement and committed perjury. Why wouldn't that be an authority that could be exercised? Well, the Supreme Court in Painter, Your Honor, has held that district courts may not use their inherent authority to establish sub-constitutional standards. And in particular, this court after Painter has held that the Fourth Amendment is a particularly inappropriate circumstance for the court to exercise its inherent authority because there are established standards under the Fourth Amendment for when suppression is appropriate. Here, the Frank standard, and as applied in this court's decision in Raja Ratnam, which is less than five years old, particularly governs when suppression is appropriate in light of an intentional misstatement. In that case, those cases make clear that only when there's an intentional misstatement that is material, suppression- District courts are powerless then? If somebody gets up, an agent gets up and decides to lie to a judge in an ex parte proceeding, judges are absolutely powerless to do anything about that? No, Your Honor. Judges are not powerless. What judges can do is assess whether or not suppression is warranted under the Frank's analysis. And that's what the Supreme Court has instructed that district judges should do, is evaluate whether or not- But in that instance, if it doesn't meet the materiality standard of Frank's, then you're still having a situation in which an agent is knowingly lying. I'm not saying that that's foreclosed as a situation in which you have somebody who's knowingly lying to a judge. And that wasn't the facts of Painter. It wasn't about lying to a judge. Then, essentially, it's tolerating that because it's saying a judge has no inherent authority to do anything about that. Well, Your Honor, the Supreme Court, in its Fourth Amendment jurisprudence, has carefully struck the balance between when it is appropriate to exercise the exclusionary rule and when it's not. And as it has said- Judges exclude evidence all the time. If the prosecutor shows up a week before trial and has a new witness or a new piece of evidence that wasn't previously disclosed, the judge says it's not coming in. So that's part of the inherent authority in terms of controlling the trial. So why is this really different? Why can't judges say, as a sanction for lying to the court, this evidence is not coming in? Because the Supreme Court has said that the exclusionary rule is a tool of last resort, and it is only to be used in circumstances where there has been an intentional misstatement that is also material because it recognizes that the exclusionary rule inhibits the truth-finding functions of the court. So it has carefully limited those circumstances and made the determination that it's not enough to have a knowingly false statement. I would like to address this contention by the district court that the agent committed perjury. The government categorically and vehemently disputes that the agent committed perjury in this case. The district court's finding is clear error, and we request that this court expressly reverse that finding. And that is especially so when this court views the record in the light most favorable to the government as it must on this appeal. We would ask this court to evaluate two questions in considering whether or not perjury was committed here. First, what possible motivation did the HSI agent have to commit perjury in this case? And second, does the course of events here indicate perjury or an innocent mistake, as the district court itself initially found at the evidentiary hearing in this case? And looking to motive, we think it's important that this court balance the incentives versus the consequences of committing perjury. Counsel, I think at least I understand the arguments that you make there on that. I see your time's growing a little short, and I wanted to move to the GPS issue, if I could. Yes, Your Honor. The Newton case suggests that there needs to be a rule or regulation that justifies the parole search. You remember that? And that comes right out of Griffin versus Wisconsin. And my question, I guess, is was there a rule or regulation that justified the New York parole officers to engage in essentially a search for purposes of helping the federal law enforcement make a prosecution? Your Honor, I think there's the rules or regulations that govern the search here were the conditions of release, which authorized the parole officers to conduct a search of the defendant's residence, person, or property. But there's nothing in those rules or regulations that say anything about we can strap an ankle bracelet on you and monitor everything that you do for two years, is there? No, Your Honor, but this court would look to the Fourth Amendment to determine whether or not that search was reasonable under the totality of the . . . it wouldn't be . . . it would at least require a warrant after Jones, right, if the person weren't on parole or post-supervision release, right? Jones did not address the parolee context, Your Honor, and I think there's a distinction between Jones and this case. The question in Jones was whether or not a search had . . . And I understand Jones, but it seems to me when we look at all the cases with Rays, Newton, the other parole search cases, we don't have a situation in which there's two plus years of GPS monitoring, do we? No, but we do have in Newton, Your Honor, is the court making clear that the level of intrusion is not what matters here. It's not how long the search is or the nature of the search necessarily that determines whether or not federal law enforcement involvement renders it unconstitutional. But if we look at it, and I understand the argument from the other side isn't so much apart from the district court's ruling, it's about what it is that the New York state officers were doing, whether that was reasonable. And that's what I'm having a hard time understanding when we look at these very general conditions here that say giving consent to permit a search. But why would somebody reasonably understand that to mean you can put an ankle bracelet on me for two years. You could presumably, under the same circumstances, you could install cameras inside the person's bathroom in their house and have listening devices throughout their whole home. Well, Your Honor, in this case, the defendant, Mr. Lambus, was specifically advised before the GPS was put on him that he was going to be subject to that monitoring and that it may last for the rest of his supervised release. Isn't it right that in Sampson and Knight, if we focus on the most recent Supreme Court authority, there was either a statute authorizing the type of search that takes place, the law enforcement officer can conduct a search, or a court authorization for the condition at issue. While here it's a parole officer in his individual capacity who makes a determination to use the GPS. Your Honor, I see that my time is expiring. May I answer your question? So I do think that the statute here does, in fact, authorize the GPS monitoring in this case. There's two provisions here, the conditions of release. There's the general search condition, and there's also the provision that authorizes the officers to impose special conditions of release. One of those recognized special conditions of release is GPS monitoring. And I don't think that whether or not there is a statute necessarily is determinative in this case. Sampson instructs us to look at the totality of the circumstances here. We weigh the privacy interest of the parolee versus the state's interest. And in Sampson, it wasn't even a particular interest in the search at issue that the court found constitutional. It was the state's general interest in monitoring parolees that the court relied on in finding that a suspicionless search was warranted. This case has much more individualized suspicion than the facts at issue in Sampson. Sampson was based entirely on the status of the individual as a parolee and nothing more. It also has a significantly more intrusive search by any measure, right? I mean, Sampson was a one-time only search, granted suspicionless, and based entirely on the fact that the person was on parole. But this is essentially two years of GPS monitoring. Yes, Your Honor. And I would point out in our papers, we've established, I think, that during that entire two-year period, there were ongoing indications that this particular parolee was engaged in violations of the conditions of his release during that entire period. It wasn't just at the beginning. It wasn't just the middle. It wasn't just the end. It was for the entire time period. So those ongoing indications that he was engaged in violations of the conditions of his release justified the search throughout the entire time period under Sampson. If there are no further questions, the government respectfully requests that this court reverse the district court suppression order in its entirety. Thank you. Good morning. May it please the court, my name is Ron Rubenstein. I'm the attorney for Mr. Lambus related to the GPS monitoring. Mr. Kaciris will handle the Title III issue. Let me say that Judge Weissing found in any event whether the state of New York did or did not violate his rights, the federal authorities certainly did. The district court found as a matter of fact that a search was conducted for years, the sole purpose of furthering a general criminal investigation. And even Huntley says it is also significant that there was no evidence that the searching parole officers were seeking corroboration or evidence in the aid of a criminal prosecution or activities. And that's exactly... Mr. Rubenstein, was it the federal government that slapped the ankle bracelet on your client? No, Your Honor. It was the state, wasn't it? It was the state parole on the raise. State proceeding that I... And there was no federal government order in place that required the state to do that, was there? No. And there was no instruction from the prosecutor that said, go put an ankle bracelet on the supervisee so that we can know what's going to be done for prosecution? Not initially, Your Honor. Essentially what we have really is just a collaboration, right? It's a collaboration between the state probation officer, probation officers doing their job and saying there may be something very significant here. We want to pass this information on to the federal government. Isn't that what they're supposed to do? Now, not in the situation as developed here by the facts, Your Honor. But there was nothing here where the federal government engaged in any kind of search, was there? Well, they took over. No, they took over. They took over the prosecution. No, they took over the investigation. Did they require the GPS to stay on? I didn't... They made a recommendation that the GPS stay on. That was part of the scam. They wouldn't mind it if the GPS is on, but that was an independent decision, right? At the beginning to put the GPS on and throughout to keep it on. It was an independent decision made by state parole officers. No, Your Honor. It was a decision that if it was legitimate in the inception for parole supervision and it's conceded that it was only supposed to be on for six months. After six months... The order, and correct me if I'm misremembering the record, but it could have been on for the entire period. There was a written document that said it will be on for the duration of your time on parole. The practice may have been six months, but he knew that it hadn't been removed in six months. He asked for it to be removed and it wasn't. Well, the court found, court below found, that it was only supposed to be on for six months and during that six month period, Lambus did nothing wrong. After the six month period, he started asking to take the bracelet off and the supervisory people, Parker, the supervisor chief, Brown, and Kovics, the parole people, they were not informed of any violation. The government said here in their argument that there were continuing violations. Unfortunately, the supervisors, the people that had to make the decision and Chief Parker had to make the decision whether or not to continue the monitoring after the three to six months. That's what the manual says. I think it's four to six months rather. He never had the ability to do that because he was kept in the dark about the entire investigation because Scanlon, we have the BSS, which is an investigative agency of parole. It's not the supervisor agency. BSS is supposed to investigate if they think there is wrongdoing and turn that information over to the supervisors so the supervisors can make an intelligent decision whether or not to violate this individual. But it's not improper, is it, for BSS to cooperate with federal law enforcement efforts? It's not improper, but in this case, in the facts of this case, for over two years to have an ankle bracelet on him as part of the investigation with no legitimate parole reason. In other words, Judge Scanlon, the BSS officer, became an honorary federal agent. He even was involved in monitoring wiretaps. He's the one that put the handcuffs on Lambus in July of 2015 to arrest him. So he really stopped functioning as a person of parole. He actually was a federal agent for federal purposes. And the feds, in December of 2013, when the federal government went, when the federal agents went to the U.S. Attorney's Office, the U.S. Attorney's Office said, no, you don't have enough drugs here for us to be involved. You said earlier, and I just want to make sure I understand this correctly, you said in the six months, the initial six months of surveillance, there was no indication of possible parole violations? Correct, Your Honor. As a matter of fact, the parole people, Brown testified that he only looked at the summaries and there was no indication. They were looking for, the parole supervision was looking for a violation of curfew. That's what they were looking for. And there were violations of curfew through the GPS system later on, after the six months. But Scanlon from the BCS never told the supervisors. They kept it in the dark. So it clearly is not rational and reasonable to keep this GPS on after the six month period solely for the purpose of conducting what was a federal investigation. What's the had no allegedly proper parole purpose? Well, the evidence that is pretty clear, Your Honor, because when they applied for a, for the Title III, they specifically said in that application that the GPS was on for a parole violation. And then they listed when court authorized warrants. So they knew the difference. And the court found below that they clearly knew that they had no right, that they knew that there was no warrant in place by a court. And they were aware of that. And the interesting thing is when they thought that the GPS wasn't working, that parole put on, they went to a court and they got a warrant. They got for the, for the telephone, which clearly they would have had to have done. But in light of a cases like Sampson, Knights, and the other cases that recognize a diminished expectation of privacy for parolee, why wasn't it at least reasonable or debatable on the federal government's part, or for that matter, on parole officers part, that this was not violating the constitution such that the exclusionary rules should apply? Well, I don't think any court under federal rule 41, where you have a right to go in front of a magistrate, get a warrant for a GPS, you're supposed to keep it on for 45 days and then go for a renewal. Sampson, for instance, Supreme Court says there's parolees have to sign something. They're going to be on parole. They agree in writing to be searched by a parole officer or a law enforcement agent at any time, with or without cause. And in that case, a law enforcement agent, we presume he may have been motivated by the desire to find evidence, encounters a parolee, and performs a search. And the court says it's reasonable under the Fourth Amendment. Yeah, that's related to a state statute in California, which permitted that kind of conduct. New York State were governed by Huntley. Huntley doesn't permit that kind of conduct. And therefore, under Huntley, we, each state, the Supreme Court goes by what the state's rules and laws are. The law of New York State is that it has to be reasonable and rational. And in this case, it was, it's not reasonable and rational. I don't know where the line would end between six months and two years, but for sure it would end a long time before 25, 26 months, as it did in this case. If there's no other questions from the panel, I thank you for your time. I represent Stanley Fuller, and I'm honored to be here. Judge Livingston, Judge Meyer, you raise the questions at the heart of this. And I have to say they are such important questions. Because there does come a point, there has to come a point, in all the cases cited by the government, and that you spoke of, Judge Meyer, they clearly support this. There has to come a point where a district court judge can say, you can't do this. I'm stopping it right here. And committing a pejorious statement, making a pejorious statement in a wiretap application, then compounding it with the explanations put forth at the hearing, also under oath. It has to be that point. And all of the cases say that. Because all of the cases, whether it be Painter, whether it be Donovan, whether it be Callum, all of them speak of. So perjury requires inherently a materiality inquiry, doesn't it? It does. And Judge, why is this material? I've seen wiretap applications. They're about as thick as a telephone book. There are just a huge number of facts that are stated in there. They're important. They're required. It's essentially called a super probable cause warrant with good reason. Because oftentimes these wiretap applications well exceed what is required for probable cause. Why is it that the misstatement here, intentional, even if we assume it's intentional, really could be reviewed as material? Well, first of all, Judge Weinstein having as many years on the bench as he has, when he says the word perjury, he does know the definition of it and he is extrapolating it from the testimony. But it's a good question. Let's really look at what happened here. What happened here in terms of materiality is you have an agent who has done wiretaps before, who is working with an assistant United States attorney also experienced in this. This is not a different investigation. He's dealing with an investigation that is really a continuing investigation and he's aware of it. He knows of the prior applications. He knows Fuller was intercepted. He knows Fuller is a target. He knows Fuller is somebody that he's looking to intercept here. This was not some buried fact of no consequence. 2518 specifically requires that you list the prior applications. He does not list the prior applications. And right before that, he says that Fuller is somebody I believe there is probable cause will be intercepted. And then under oath, his explanation before Judge Weinstein is, you know, I didn't put him down because I didn't think he would be intercepted. Then you have a USA Kenji Price submitting also a sworn affidavit saying these words, I have discussed the full facts and circumstances surrounding this application with Agent Popalov and there are no prior applications in this case. So it goes on and on and on and on. And Judge Livingston, you're right. There should be a more fulsome hearing as there was in Raja Ratnam and in so many other cases, because as this court held in Raja Ratnam, Raja Ratnam seems to be the case, the golden case that the government hangs its hat on with these because there was a fulsome hearing made a determination that Judge Hallwell improperly concluded that the statements were made recklessly because he did not look at the subjective intent. And that's because he had a fulsome hearing where everybody took the stand and said, look, this is why we did the original hearing. Correct me if I'm misremembering the record. But the the original statement was that the agent was careless. The statement that the perjury comes in a written opinion that's issued later and it's issued before the government has responded to the allegations of the defense that this wasn't carelessness, this was perjury. So the government had no opportunity to respond. I understand that, Your Honor. However, Judge Weinstein did indicate that he was suppressing. And then apparently upon reading the submissions and reading the record, he made a more detailed decision in which he found it to have been perjury. But it's a good question. And you're right. Judge Weinstein may have done things slightly unconventionally here. But why then did not the government, as it does all the time, move to re-argue as Mr. Rubenstein did on the GPS? Why did not the government say, Your Honor, we have other exhibits. May we please present additional testimony? Because and I say this most respectfully, this is a record that they want to come to this court and just have it fixed in its entirety. They want you to make a determination it wasn't perjury without a fulsome hearing. They want you to make a determination that it's not material without a fulsome hearing. Why? Why did they not do that? What possibly could have come from a more fulsome hearing when the Assistant United States Attorney is called to the stand, presented with her sworn affidavit in which she states that she went over all the facts and circumstances and there were no applications? In response to your question, Judge Meyer, these are all experienced people. How many times can you write something down that's not true, that you know is not true, and not realize it's not true? This investigation, the government also claims with material . . . My question is related much more to the issue of materiality and why it would have made a difference to the judge's issuance or approval of the wiretap application. The answer to your question is this. Most of these cases deal with materiality from a probable cause standpoint, and you're so right. These applications are chock full of probable cause, and taking an inconsequential fact in or out is not going to affect probable cause. But Congress, when they enacted 2518 and put subsection E in there, specifically said the prior applications, not necessarily for probable cause, they go to necessity. So why is it material? Because Judge Gleeson would have known not only that there were prior applications, he would have known that the very person that the government sought to identify in the January 2015 wiretap was already identified, he was already overheard, that there were informants that identified him as a supplier and as a buyer to one of the agents. He would have also known, and this goes to the staleness— This goes way back to, wasn't it 2011? And to your question, and this goes to the government's assertion that the information was stale. It boggles the mind because this Court has ruled time and time again that when you look at staleness, one issue you need to look at is a continuum. And in our submissions to the Court, we presented a graph of a continuum here. This isn't stale information. The wiretaps in 2011, the investigation continues in 2012, 13, 14, 15 with informants, controlled purchases, all sorts, every possible type of investigative technique, and Judge Gleeson would have been able to look at the government and say, wait a minute, you know who Fuller is. You intercepted him. You've got additional information. You've got physical surveillance of him and Lambus. It wasn't just the omission of a stale wiretap. This was a wiretap after which the United States government and the agents continued investigating not different people, same targets, same organization, same name, same location, same drug, same modus operandi, and they had continued that investigation throughout. If the government stood before you today in another case where the defense was saying that that wiretap was stale, I assure you they'd be standing here saying, no, Your Honor, it's not stale because this investigation went month to month, year to year, and there was a continuum of investigating, fruits of investigation which followed that. So 2518E does not go to probable cause. It goes to necessity, and Judge Gleeson had the right to ask those questions. Thank you. Thank you. Your Honor, just a couple of brief points. Picking up on that last point on materiality, I think there's two points to raise here. First is that this court's decision in Bianco expressly held that 2518E is a non-central provision of Title III, and I think inherent in that decision is a determination that it's not a material violation of Title III when such a violation occurs. Also, it's not just that these wiretap affidavits were stale, it's also the fact that they didn't relate to Earl Davis. This was an affidavit seeking to intercept Earl Davis on his telephone. The previous investigations had nothing to do with Earl Davis, so it's hard to see how those investigations would be... And the disclosure that would have been required would have been just the fact of the prior wiretaps, is that right? That's correct, Your Honor. Not some further detail about the continuum, as we just heard from defense counsel. That's correct, Your Honor. And also, it's worth pointing out that these earlier investigations were not into the same organization. They were into a different group of people who were, I would say, the leaders of the organization in 2011. By 2015, it's an entirely different organization with some overlap, but it's not the same case. I think also notably absent from the defendant's argument here is any discussion of why the agent would commit perjury. He did not address the question of what the motive was. And looking at this particular omission, it's not material. So why would this agent risk all these severe consequences to his career, to be accused of a crime by a federal court, to potentially be fired, to potentially be disbarred because he is a lawyer, for an immaterial fact? The government's wiretap applications did not fall on this ELSER check. It did not rise or fall on whether or not these prior investigations occurred. And I think if the defense can't answer that question here on this record, this perjury finding cannot stand. It would be an injustice on this record to hold that this agent committed perjury with these sparse facts. And the government respectfully requests that this court reverse that finding. Thank you all for your arguments. Well argued.